INTERNATIONAL–GREAT NORTHERN R. CO. v. LOWRY.

No. 5792.

Court of Civil Appeals of Texas. Texarkana.

Motion for Rehearing Filed May 24, 1941.

Rehearing Denied July 3, 1941.

Sewell, Taylor, Morris & Connally, W. J. Knight, and Andrews, Kelley, Kurth & Campbell, all of Houston, for appellant.

Lasseter, Simpson, Spruiell & Lowry, of Tyler, for appellee.

WILLIAMS, Justice.

In this suit for damages for personal injuries grounded upon negligence, James O. Lowry recovered judgment against appellant, International-Great Northern Railroad Company, defendant below. The nature and details of this litigation are fully set out in the opinion of this court on a former appeal reported in 98 S.W.2d 383, and of the Supreme Court reported in 132 Tex. 272, 121 S.W.2d 585.

In the instant trial, "the facts found by the jury in answer to special issues were in substance as follows: The failure of the conductor to have the train stopped" at Gould, and its operation through Gould at a reckless and dangerous rate of speed, each was negligence and a proximate cause of appellee's injury. "Oil that was leaking in perceptible quantities from the tank car on the track at Gould near the company's main line created an unusual hazard and danger to the railroad company's property." Appellee "believed that the leaking oil created an unusual and imminent danger and hazard, and laboring under such belief, impulsively and without time for reflection as to the danger to himself, and not knowing that he would endanger his safety, alighted from the moving train in order to repair the leak in the car. An ordinarily careful and prudent person, under all the facts and circumstances at the time, would have alighted from the train." The act of appellee in not remaining on the train and in jumping therefrom was not negligence. Damages were assessed at $14,000. The jury further found in response to special issues 13 to 16, inclusive, that appellee, when he realized that the train was not going to stop to permit him to alight at Gould, became so confused that he was rendered incapable of rational and prudent action with respect to his act in alighting from the train; this confusion was proximately caused by the negligence of appellant; a person of ordinary foresight and prudence, similarly situated, would have become confused in the manner and to the extent appellee was confused; and that he exercised ordinary care, under all the circumstances, up to the time he became confused. Above jury findings are the same as detailed in the opinion of the Supreme Court, save and except the submission of above issues Nos. 13 to 16 inclusive, the findings thereon, and that appellee was not guilty of contributory negligence.

In the first trial appellee introduced in evidence the oral depositions which had been taken by him of his helper, Mr. Pope, who was proceeding on the same train to assist appellee in repairing the tank car. A portion of the testimony of the helper as given in the deposition is as follows:

"Q. As you got into the station of Gould, state what happened next, Mr. Pope. A. Well, after we saw the train was not going to stop, he asked me what we were going to do about it. I said, 'I am going to ride on through.' I said, 'What are you going to do about it?' and he said, 'We have to fix that tank car.' I said, 'We can't get off the train running,' and he said, 'Yes, but we must fix the tank.'

"Q. What happened next? A. He said, 'We must get off of it.' I asked him how, and he said, 'We will jump off,' and he said for me to jump."

In the instant trial appellee did not introduce the alleged conversation above quoted, and denied that he had any conversation with Pope with reference to getting off the train. Appellant introduced same in evidence. Appellee's brief in discussing this, states: "It is true that on the first trial the deposition of the witness Pope was introduced by appellee, which contained the discussion that Pope said was had between himself and appellee. During the first trial nobody interrogated appellee about the conversation. If he had been asked, he would have denied it. When asked about such a conversation on the second trial, he denied such a conversation took place." In the first trial appellee testified that he could see oil leaking out of the tank car, there was a big puddle of oil on the ground and oil was running out of the tank. He did not think the train slowed down as they came near the tank car. "I figured it was going about 12 or 15 miles an hour," and judged that he "could get off of it safely at that time." In the instant trial appellee testified, "I seen oil all over the ground, looked to me like a half-tankful on the ground. When I saw the train was not going to stop that just shocked me all over, I was confused what course to pursue down to the time I left the train. That daze continued until I got off. I made my mind up to get off whenever I seen they were not going to stop and that was about 50 yards from the tank. I reckon I had all kinds of thoughts why they were not going to stop. The oil was about 10, 15 or 20 feet from the main line, lots of trains would pass, oil was inflammable, and I knew it was a dangerous situation." Burton, who did not

testify in the first trial, says he "saw a good deal of oil on the ground, well, it was kind of dripping down from the tank car, lots of it on the ground, stream of it running down a natural drain away from the tracks and toward my house to the East which I dammed up about 50 yards from the track, and dipped up maybe 25 gallons." He places the tank car on a siding track, with a passing track between it and the main line track to the west. Frady, the other new witness, testified that the gases in East Texas crude oil makes it easily combustible and inflammable, which could be set off by a spark; that these gases are volatile and when exposed to the air or poured on the ground have a tendency to release the gas to a certain extent; and if ignited on the ground the flame would leap back to the tank. Save and except the evidence and observations above set out, the evidence in the instant trial is the same as detailed and discussed in the opinions on the former appeal.

Appellant's various propositions, predicated upon its motion for an instructed verdict, exceptions to the submission of various issues, its motion for judgment non obstante veredicto and its attack on various jury findings, are embraced in its first two propositions wherein appellant asserts: (1) there is no evidence to show that the alleged acts of negligence of the appellant was a proximate cause of appellee's injuries; and (2) "The evidence * * * not being materially different from the evidence upon the first trial * * * with respect to whether the alleged negligence of the defendant was a proximate cause of the plaintiff's injuries, the decision of the Supreme Court, upon the former appeal, that such negligence was not a proximate cause of plaintiff's injuries is the law of the case, and the trial court erred in failing to so hold." Appellee replies:

"Under the old record the Supreme Court said there was no evidence to show that appellant's negligence caused appellee to jump from the train, and further stated that there was no evidence to show that he jumped impulsively because of apprehension of danger to appellant's property, but instead of acting impulsively, he discussed the situation with his helper and chose his course of conduct voluntarily and in accordance with his own judgment. Under the present record it is shown that appellee did jump impulsively because of apprehension of

danger to appellant's property and while in a state of mental confusion brought about by appellant's negligence, and that his act in jumping was the result of appellant's negligence in creating this state of circumstances, and in law the creator of such circumstances is the producer of the direct and proximate cause of the resulting injuries."

And in support of this theory as announced in Section 443, Volume 2 of the Restatement of the Law of Torts, "that an intervening act which is a normal response to the stimulus of a situation created by the actor's negligent conduct, is not a superseding cause," cites San Antonio & A. P. Ry. v. Ankerson, 31 Tex.Civ.App. 327, 72 S.W. 219; Kansas City Consol. Smelting & Refining Co. v. Taylor, 48 Tex.Civ.App. 605, 107 S.W. 889, and cases therein quoted from; Trinity & B. V. Ry. Co. v. Elgin, 56 Tex.Civ.App. 573, 121 S.W. 577; Texas & P. Ry. Co. v. Carter, Tex.Civ.App., 73 S.W. 50; Erie R. Co. v. Caldwell, 6 Cir., 264 F. 947. This theory of the case was presented on the former appeal and decided adversely to appellee's contention, with the statement by the Supreme Court that appellee's "act in jumping from the moving train was a highly extraordinary, rather than a normal, response to the situation." [132 Tex. 272, 121 S.W.2d 589.]

It is apparent from the Supreme Court's opinion that appellee there urged, as here, that the leaking oil car created an unusual danger and hazard to the railroad property, and that appellee, laboring under such belief, impulsively and without time for reflection as to the danger to himself, jumped from the train in order to repair the leak. In weighing this theory of the case and with jury findings in support thereof, the Supreme Court applied the rule of foreseeableness as the test in deciding if the negligence of appellant in failing to stop the train was the proximate cause of appellee's injury. The court after stating that "The accepted test in this state for determining such question is whether the injury, or a similar injury, might reasonably have been anticipated as the natural and probable result of the negligent act," concluded:

"In our opinion it clearly appears from the facts in evidence that the injury suffered by defendant in error was not the natural and probable consequence of plaintiff in error's negligence and that it was not an injury that might reasonably have

been anticipated. Inconvenience to defendant in error and the loss of time on account of being carried beyond his destination, instead of physical injury, would have been the natural and probable consequences of the failure of the conductor to cause the train to stop. Defendant in error's jumping from the train moving at thirty-five miles an hour was not reasonably to have been anticipated. He was not required or expected in the performance of his duties to board or alight from trains in motion. A person of ordinary prudence under the same circumstances would have remained on the train and returned to Gould on another train. It was shown without contradiction that there were heavy movements of oil and many freight trains passing over the railroad in that vicinity.

"While it is true that one of the messages sent to defendant in error directed him to rush to Gould on 'the first thing available' to stop the leak in the car, there is no evidence of the existence of a great emergency, of imminent serious hazard or of occasion for precipitate action. The message was sent at 10:15 A. M. The leaking car had been set out on the day before. Defendant in error testified that as he approached the station at Gould he saw oil leaking out of the tank car and that 'there was a big puddle of oil all on the ground and oil running out of the tank'. The helper, Pope, whose testimony by deposition was offered in evidence by defendant in error, testified that he saw the oil leaking from the car, which appeared to have been sideswiped, that the oil was dripping and splattering on the running board of the side of the car next to the main track, that he judged it was probably leaking a gallon every thirty minutes, and that he thought there was about a barrel of oil on the ground. This is the extent of the evidence offered to prove the existence of danger or hazard to property of the railroad company. In our opinion it does not tend to prove such imminent danger or hazard as would cause a reasonably prudent person to jump from a train traveling at the rate of thirty-five miles per hour (or even twelve or fifteen miles an hour, the rate at which defendant in error believed the train was moving) in order to stop the leak. *22 R.C.L.*, pp. 146, 147, § 30."

 In our judgment the above holding of the Supreme Court is the law of the case and controls its disposition in the instant appeal adversely to appellee. Save and except in the particulars hereinabove observed, the evidence here presented is substantially the same as on the former appeal. Quoting from appellee's brief, "the new testimony in the case is the testimony of appellee to the effect that he was confused at the time he alighted from the train, and that he jumped from the train in an effort to remedy a dangerous situation and protect appellant's property." This additional evidence bearing on the "confusion" theory would be a factor in determining if appellee was guilty of contributory negligence. Appellee has not in any respect added to the evidence any fact showing the conductor's knowledge of the facts with regard to the foreseeability that was not before the Supreme Court when it passed on the case, and upon which question of foreseeableness the disposition of the case turned on the former appeal.

For the reasons indicated, the judgment is reversed and the cause remanded.